Boies, Schiller & Flexner LLP
Alison L. Anderson (SBN 275334)
*alanderson@bsfllp.com*
Joshua Y. Quaye (SBN 325480)
*jquaye@bsfllp.com*
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: (213) 629-9040
Facsimile: (213) 629-9022

Kenya K. Davis (*pro hac vice forthcoming*)
1401 New York Ave., NW
Washington, DC 20005
*kdavis@bsfllp.com*

*Attorneys for Plaintiff Jane Doe*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

JANE DOE,

        Plaintiff,

        vs.

LYFT, INC., a Delaware Corporation;
DOES 1 through 20, Inclusive,

        Defendants.

CASE NO.: 2:25-cv-11418

**PLAINTIFF JANE DOE COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

     Plaintiff, Jane Doe, by and through her undersigned counsel, brings the following Complaint against Defendants Lyft, Inc., a Delaware Corporation ("Lyft") and DOES 1 through 20 ("Doe Defendants") (collectively, "Defendants").

# TABLE OF CONTENTS

I.      Nature of the Action ........................................................................... 3

II.     Parties ................................................................................................. 3

III.    Jurisdiction and Venue ....................................................................... 5

IV.     Factual Background ............................................................................. 6

        A.      Lyft, Inc. ............................................................................... 6

        B.      Lyft's Promises .................................................................... 8

                1.      Lyft Controls Its Drivers and their Vehicles ............ 10

                2.      Lyft's Financial Model ............................................. 12

                3.      Lyft Failed to Provide Plaintiff Promised Facial
                        Recognition Safety Features ...................................... 13

                4.      Lyft's Failure to Monitor Rides ................................ 13

                5.      Lyft's Product Liability ............................................ 15

        C.      Lyft's Designed a Defective Product ................................... 18

        D.      The Sexual Assault ............................................................... 19

## I.    Nature of the Action

1.    Defendant Lyft, Inc. paired Plaintiff Jane Doe with a driver who sexually assaulted her.

2.    Lyft is vicariously liable for injuries inflicted by the driver.

3.    Through Lyft's officers, directors, employees, consultants, and managing agents, Lyft contributed to the Plaintiff's sexual assault by breaching the duty of care it owed to Plaintiff as a Lyft rider and customer.

## II.    Parties

4.    Plaintiff Jane Doe is over the age of eighteen and is a current resident of Nevada.

5.    Plaintiff respectfully requests this Court grant her motion to proceed anonymously pursuant to Federal Rule of Civil Procedure 26(c) that will be filed subsequent to this Complaint and that the Court ensure all Defendants keep her identity confidential throughout the pendency of the lawsuit and thereafter.  As set forth in her Rule 26(c) motion, disclosure of Plaintiff's identity would invade her privacy when it comes to a sensitive, highly injurious sexual assault, expose her to stigmatization, and make her vulnerable to public and private retaliation or discrimination.  This is especially true given Plaintiff's public persona and profile in the entertainment industry as a film and television actress.

6.    Lyft is presently defending a significant number of sexual-assault suits in which anonymity has been deemed appropriate.  Here, as in those cases, the plaintiff's compelling privacy interest decisively outweighs any potential prejudice to Defendant and any marginal public value in revealing her name.  Counsel for Plaintiff will provide Lyft with Plaintiff's true name.  Plaintiff will also seek entry of a protective order to prevent the unnecessary disclosure of Plaintiff's real name in the public record.

7.     Defendant Lyft, Inc. is a Delaware corporation with its corporate headquarters, principal office, and principal place of business at 185 Berry Street, Suite 400, San Francisco, California 94107.  Lyft is a transportation network company subject to the laws of California, the United States, and other jurisdictions.

8.     The true names and capacities, whether individual, plural, corporate, partnership, associate, agent, or otherwise, of Does 1 through 20, inclusive, ("Doe Defendants") are unknown to the Plaintiff and thus these Doe Defendants are sued under fictitious names.  Plaintiff does not currently know the full extent of the facts connecting these Doe Defendants but believes, and therefore alleges, that each of the Doe Defendants was, and is, in some actionable manner, responsible for the events, actions, representations, omissions, and inactions, that legally caused injury, harm, and damage to Plaintiff.  Plaintiff will seek leave of Court to amend this complaint to show the Doe Defendants' true names and capacities after the full extent of the facts discussed above have been ascertained.

9.     Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, each Doe Defendant was the agent, servant, licensee, employee, assistant, consultant, driver, or alter-ego of each other Defendant, and was at all relevant times acting within the course and scope of that relationship when Plaintiff was harmed.  Defendants are liable for the acts of each other through principles of respondeat superior, agency, ostensible agency, partnership, alter-ego, and other forms of vicarious liability.

10.     Plaintiff is informed and believes that the Defendants, when acting as a principal, was negligent in the selection, hiring, supervision, or retention of each other Defendant as an agent, servant, employee, driver, assistant, or consultant.

11.     Plaintiff is informed and believes that, at all relevant times, each Defendant, by and through its officers, directors, supervisors, and managing agents, and each Doe Defendant, had advance knowledge of the wrongful conduct,

psychological profile, and behavior propensity of said agents, servants, licensees, employees, drivers, assistants, and consultants, and alter egos, and allowed said wrongful conduct to occur and continue to occur, thus ratifying said wrongful conduct, and after becoming aware of their wrongful conduct, Defendants authorized and ratified the wrongful conduct that injured Plaintiff.

12.     Lyft drivers transporting Lyft riders, including the registered Lyft driver, "Vahe" ("Registered Lyft Driver), and the Lyft driver who picked up and assaulted Plaintiff ("Lyft Driver") were agents, associates, consultants, licensees, assistants, servants, and employees of Lyft at all relevant times.

## III.    Jurisdiction and Venue

13.     The Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

15.     The events or omissions giving rise to the claims in this Complaint occurred in, and are inextricably tied to, Los Angeles, California—including, but not limited to, the location where Jane Doe requested the Lyft ride at issue, was picked up by a Lyft driver, and was ultimately assaulted by that driver.

16.     Lyft's principal place of business is in California.   All corporate decision-making with respect to passenger safety issues is centered at Lyft's corporate headquarters in San Francisco, California.   All executive decision making by Lyft regarding hiring policies, handling of complaints regarding drivers, driver termination policies, driver training, driver supervision, and driver standard operating procedures occurred in San Francisco.

17.    All executive decision making on the part of Lyft regarding its marketing campaigns and representations to Lyft riders regarding Lyft safety occurred in San Francisco, California.

18.    Lyft's contract with Lyft riders specifies that the agreement should be governed by California law.

## IV.    Factual Background

19.    In the early hours of February 1, 2023, Plaintiff Jane Doe chose to take a rideshare to visit a friend.  She chose a rideshare operator that has, for years, advertised itself as a safe alternative for female riders seeking safe and reliable transportation options from bars and entertainment venues: Lyft.[1]

### A.    Lyft, Inc.

20.    Lyft, Inc. is a publicly traded company (Nasdaq: LYFT) that provides transportation services using the Lyft application it created, advertises, operates, and maintains.  Lyft accomplishes its control using a variety of requirements for riders. For example, Lyft requires that riders provide it with a valid form of payment.  Upon receipt, Lyft provides riders with application access.   On the other hand, Lyft approves every vehicle used to transport its riders and requires all Lyft drivers successfully complete several background checks before they are granted application access.

21.    Lyft advertises to the public and its customers, including Plaintiff, the specific standards that its drivers must satisfy before they are authorized to engage with riders through the Lyft application.  For example, Lyft indicates California drivers must be at least 25 years old and have possessed a valid California driver's license for at least a year.  Lyft also advertises that it requires California drivers maintain their own insurance coverage, even though Lyft itself provides primary

---

[1] Lyft, *Economic Impact 2017*, (2017), https://take.lyft.com/economic-impact/2017/Lyft-Drives-Economy-pre.pdf.

insurance coverage to its drivers when the Lyft application is on and during a Lyft ride.[2]   Among its publicized requirements, Lyft specifically indicates that all California drivers must "[c]omplete a driver screening, which includes a driving history check and criminal background check."[3]

22.   Lyft, like any other company, is bound by applicable federal, state, and local laws, and regulations, including those governing eligibility to work in the jurisdictions in which it operates.  The requirements are not pro forma: Lyft must verify its compliance.  To satisfy legal obligations—and, by extension, to protect the safety of Lyft riders—prospective drivers must upload all required documents, which Lyft then must review, verify, and authenticate before approving any driver for application access.  For example, in California, Lyft—as a transportation network company regulated by the California Public Utilities Commission—is required by California Public Utility Code § 5445 to complete background checks of its drivers.  Since 2020, a second law, California Business & Professions Code § 7458 also required Lyft to conduct driver background checks.  Lyft is also required to follow the laws of the United States, including but not limited to, ensuring that those that drive for Lyft are legally authorized to work in the United States.

23.   Lyft didn't do any of this for Jane Doe.

24.   Lyft never confirmed the identity of the driver operating Jane Doe's Lyft.

25.   Lyft never confirmed the driver's age or license status.

---

[2] Lyft, *Driver requirements*, Lyft Help, https://help.lyft.com/hc/en-us/all/articles/115012925687-Driver-requirements (last visited Nov. 26, 2025); *see also* Lyft, *Insurance*, https://www.lyft.com/driver/insurance (last visited Nov. 26, 2025).

[3] Lyft, *California Driver Information*, Lyft Help, https://help.lyft.com/hc/en-us/all/articles/115013080708-California-Driver-Information (last visited Nov. 26, 2025).

COMPLAINT
Case No. 2:25-cv-11418

26.     Lyft never confirmed whether the driver provided insurance or registration documents.

27.     Lyft never confirmed the driver was legally permitted to work in United States.

28.     Lyft never conducted *any* screening of the Lyft driver it sent to Jane Doe before her sexual assault—no check of his driving record and no criminal background check.

29.     Lyft's failures fall well below the standard of care owed to Jane Doe and violate several California and federal law.

**B.     Lyft's Promises**

30.     Lyft consistently advertises to, and invites the public, particularly young, unaccompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, even though Lyft knows that rider sexual harassment, assault, and sexual abuse is prevalent and rampant among Lyft drivers. Lyft also knows that registered Lyft drivers often evade Lyft's purported safety protocols by providing their Lyft application access credentials to unregistered drivers.

31.     From its launch, Lyft distinguished by its pink logo and large signature mustaches branding scheme, positioned itself as a more female friendly and safer alternative to rivals.

32.     In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft riders during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city."[4]

---

[4] Lauren Kaori Gurley, *Lyft Has Been Flooded With Sexual Assault Lawsuits*, Vice, (Aug 21, 2019), https://www.vice.com/en/article/lyft-has-been-flooded-with-sexual-assault-lawsuits/.

33.    In November 2016, Lyft's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out."[5]  The insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault.

34.    In September 2019, Lyft publicized a partnership with the Rape, Abuse & Incest National Network ("RAINN"), the country's largest organization supporting survivors of sexual violence.[6]  In 2020, Lyft continued to advertise the relationship, using it to attract riders and generate revenue by promoting an initiative providing free transportation to individuals contacting RAINN's National Sexual Assault Hotline.[7]  The program purported to offer critical resources to survivors fleeing unsafe situations, where access to support and safe relocation is vital.[8]  Riders, like Jane Doe believed it.

35.    Nowhere on Lyft's website does Lyft disclose the current occurrence of sexual assault by Lyft drivers.  Nor does Lyft address the prevalence of individuals using another Lyft drivers' account to bypass Lyft safety features.  As a result, many unaccompanied women, like Plaintiff, use Lyft with the expectation that they will not

---

[5] *See* Letter from Sen. Richard Blumenthal, Senate Comm. on Commerce, Science, and Transportation, to Logan Green, CEO, Lyft, Inc., fn. 7 https://www.blumenthal.senate.gov/imo/media/doc/Final%Lyft%Letter%Signed.pdf (September 25, 2019),  (on file with Plaintiff) (citing Lyft, *Get Home Safely with Lyft*, Lyft Blog, Nov. 2, 2016 available at https://blog.lyft.com/posts/get-home-safely-with-lyft).

[6] Lyft, "Reinforcing Lyft's Commitment to Safety," LYFT Blog (Sept. 10, 2019), https://bit.ly/49MvMv7.

[7] Lyft, "Lyft partners with RAINN to provide access to transportation for survivors of intimate partner and sexual violence, LYFT Blog (May 18, 2020), https://bit.ly/3M0JbFU.

[8] *Id.*

be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by Lyft drivers.

36.    Lyft does not report accurate statistics regarding sexual harassment or sexual assault by its drivers.  Lyft does not disclose the number of times Lyft drivers have allowed unknown individuals to drive Lyft vehicles.  Lyft does not disclose its internal policies or procedures on dealing with sexual assault by its drivers.  Lyft fails to provide customer service representatives with adequate training to respond to serious allegations of driver misconduct.  As a result, riders reporting driver sexual abuse have been later matched with the same Lyft driver.  Lyft profits while dangerous Lyft drivers continue to assault riders using Lyft services.

37.    In short, Lyft fails to follow reasonable safety procedures and intentionally advertises and invites riders to use Lyft services while in a vulnerable state.  The result: Plaintiff—and thousands of women just like her—have been attacked, sexually harassed, assaulted, and raped by Lyft drivers.

**1.    Lyft Controls Its Drivers and their Vehicles**

38.    Lyft exercises significant control over its drivers.  All Lyft fares are determined and collected by Lyft.  Drivers don't decide rider fares: Lyft does.  When demand is high, Lyft, not the driver, sets a higher fare.  One way Lyft generates revenue is by charging a fee for every ride.  To maximize revenues, and invite the largest applicant pool, Lyft doesn't charge drivers to access the Lyft application.  It's free.  Lyft employs this system to maintain total control of its application and the interactions between drivers that access it to transport Lyft riders.

39.    Lyft prohibits its drivers from answering passenger inquiries about booking rides outside of the Lyft application.

40.    Lyft has the power to terminate drivers with or without cause.

COMPLAINT
Case No. 2:25-cv-11418

41.     Lyft drivers are expected to accept all ride requests while operating Lyft. Lyft drivers who reject or cancel too many ride requests risk facing Lyft's discipline, including suspension or termination.

42.     Lyft provides—and requires its drivers display—unique Lyft-branded materials making Lyft drivers easily identifiable and distinguishable from competitor rideshare services.

43.     Lyft also allows riders to provide comments regarding their experiences with Lyft drivers.  Assuming one's Lyft driver is registered with or known to Lyft, the only information riders are provided is a description of the Lyft vehicle, the Lyft driver, the Lyft pickup location, estimated details regarding the distance and duration of the Lyft ride, and the cost Lyft will charge the rider.  Critically, Lyft does not provide safety information regarding the Lyft driver.  For example, Lyft does not provide prior rider complaints regarding its drivers.

44.     Lyft does not indicate whether rider comments detailing their rides and Lyft drivers are shared with drivers.  The result is a rideshare culture where riders are fearful that giving honest feedback will negatively impact their passenger star rating—or result in retaliation from the driver.

45.     Lyft also maintains comprehensive control over the vehicles it deploys to riders by establishing criteria for vehicle participation and managing Lyft activity. For example, by specifying requirements for insurance, registration, vehicle type, make, model year, seating capacity, and trim, Lyft determines which vehicles are eligible to transport riders.

46.     Using its approved pool of vehicles, Lyft directs all rider transportation. The company controls which vehicle will be sent to pickup each rider, the route the vehicle takes to the rider pickup, how long the vehicle will wait for the rider, the route from the pickup to the rider's destination, and the fare to be charged.

COMPLAINT
Case No. 2:25-cv-11418

47.    The extent of control demonstrates that Lyft does not merely "host" an open platform.  Rather, Lyft actively operates a vehicle-based transportation system by controlling its composition and behavior.  By defining entry criteria, regulating vehicle participation, and directing activity—*in real time*—Lyft functions as the sole authority controlling vehicles transporting Lyft riders, not as a passive intermediary.

48.    The exercise of control is not incidental: the central role Lyft executives designed allows the company to compete with other rideshare operators.  That is to say, Lyft controls vehicle eligibility and—more importantly—vehicle movement to maximize revenue.  Lyft's financial model would be turned upside down without control.  If Lyft actually were a passive intermediary, it would be unable to maintain vehicle quality or availability, and it would have no basis to charge riders, like Plaintiff, a consistent fare for transportation services.

**2.    Lyft's Financial Model**

49.    Lyft's business model places a premium on expanding the number of drivers operating vehicles on its platform.  More drivers yield more rides, and, in turn greater revenue for the company.  Lyft's compliance with the law—and its own advertised and published safety efforts—would if fully implemented, reduce the pool of eligible drivers available to transport riders and thereby diminish its profits.  As a result, Lyft is financially incentivized to—and does—forgo efforts to fully comply with its legal and internal safety obligations.

50.    Lyft experiences substantial driver turnover, owing in part to compensation levels that prompt many drivers to seek other employment.  This dynamic reinforces a business model that emphasizes onboarding as many new drivers as possible while retaining existing drivers at the lowest meaningful level of compensation.  This practice prioritizes profitability over rider safety.

51.    Lyft's business model dynamics explain why its corporate leadership has for years made deliberate decisions to employ insufficient initial screening

1  measures, to maintain inadequate safety-monitoring practices, and to refrain from
2  adequately warning riders of the risks associated with the Lyft marketplace.

3        **3.      Lyft Failed to Provide Plaintiff Promised Facial Recognition Safety**
4                   **Features**

5        52.    In 2019, Lyft announced the implementation and rollout of an
6  "Enhanced Identity Verification" process that combined a Lyft driver's license
7  verification with certain photographic identity checks.[9]  Indeed, Lyft announced this
8  rollout via a news bulletin on "Lyft News" and the article was entitled "Lyft's
9  Commitment to Safety."

10        53.    The process was marketed to Lyft riders as an important safety measure
11  that would detect unauthorized drivers operating within the Lyft application.  Lyft
12  indicated that by requiring drivers to provide a real-time facial photograph to
13  authenticate their identities, Lyft riders would be safer.  Although Lyft announced the
14  existence and availability of the technology, it was never employed in a regular and
15  routine manner and, as a consequence, failed to provide Lyft riders—like Plaintiff—
16  the safety Lyft promised.

17        **4.      Lyft's Failure to Monitor Rides**

18        54.    Lyft, with full awareness of both the prevalence of its drivers allowing
19  unknown individuals to drive for Lyft and prior sexual assaults and rapes committed
20  by its drivers against Plaintiff and other riders, Lyft had every reason—and every
21  opportunity—to implement meaningful monitoring systems to protect its riders.  Lyft
22  is a technology company with ready access to sophisticated tools, including the
23  cameras embedded in the very devices driver must use to operate access and operate
24  within the Lyft marketplace.  Yet, despite these capabilities, Lyft failed to adopt even

25
26  _____
27  [9] Lyft, *Lyft's Commitment to Safety*, (Apr. 15, 2019),
    https://www.lyft.com/blog/posts/lyfts-commitment-to-safety.
28

basic measures that could have prevented the assaults perpetrated by its own drivers by, for example:

- Adopting a zero-tolerance policy for improper conduct and informing all drivers of the policy;

- Maintaining a surveillance camera and requiring its continuing operation during all rides;

- Saving camera footage and making it accessible for up to 72 hours after each ride;

- Informing drivers that if they turn off the surveillance system during a Lyft ride, they will never drive for Lyft again;

- Informing drivers that they may not leave the car to accompany a rider to their home or to any other location outside the vehicle, other than to provide temporary and time-limited assistance to the rider;

- Modifying the functionality of its applications so that Lyft can determine immediately if a driver deviates from these protocols;

- Monitoring rides and implementing a system whereby riders are required to confirm their intention to terminate a ride before reaching their destination;

- Performing regular and random FaceID checks that deter an unknown Lyft driver from accessing and using the Lyft application; and

- Monitoring rides and implementing a system whereby riders are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route.

55.     The ongoing sexual attacks by Lyft drivers are, and have long been, known to Lyft.  Before Plaintiff's assault, Lyft knew its business model exposed women, who rely on Lyft for safe rider experiences, to Lyft drivers that may take

advantage of their vulnerable position.  Despite its public representations, Lyft has failed to take reasonable precautions to prevent harm to its riders, including Plaintiff.

56.    At the time of the actions alleged in this Complaint, Lyft was well aware of the recurring incidents of sexual assault perpetrated by its drivers against female riders as well as the prevalence of unknown individuals driving Lyft vehicles and providing Lyft services.  Despite the established pattern, Lyft failed to take reasonable and appropriate measures to safeguard its riders.

### 5.    Lyft's Product Liability

57.    Lyft has been and remains fully aware of the safety risks it poses to its riders as a regulated transportation network carrier.  Lyft has also long recognized the dangers presented by the Lyft application it created, operates, and maintains.

58.    For example, in annual reports filed with the United States Securities and Exchange Commission, Lyft identifies several "risk factors" and acknowledges the presence of unidentified individuals using its application.  Lyft underscores "the accuracy of background check(s) on potential or current drivers and our third party providers' ability to effectively conduct such background checks" as one such risk factor in its federal filing.[10]  Lyft must operate against competitors that are better funded, have longer operational histories, and have greater market share.[11]  In fact, Lyft recognizes that its ability to "attract and retain qualified drivers on our platform, or to increase the utilization of our platform by existing drivers" is required to fuel

---

[10] Lyft, Inc., *Annual Report 2024*, at p. 13 (2025), available at https://s27.q4cdn.com/263799617/files/doc_financials/2024/ar/Lyft-Annual-Report-2024.pdf

[11] Lyft, Inc., *Annual Report 2024*, at pp. 15-16 (2025), available at https://s27.q4cdn.com/263799617/files/doc_financials/2024/ar/Lyft-Annual-Report-2024.pdf.

"continued growth."[12]  This is because "[d]rivers are generally able to switch between our platform and competing platforms."[13]  Lyft is fully aware that its goal of "continued growth" runs counter to rider safety.  Lyft's knowledge of these, and other issues, is informed by the trove of data it collects from drivers and riders.

59.    Lyft collects a wide swath of technical data from drivers and riders during a Lyft ride including, for example, vehicle speed, direction of travel, and the Lyft driver's rate of acceleration and deceleration.  Some of this data has been analyzed by Lyft to create profiles of its drivers.

60.    In June 2020—three years before Plaintiff's assault—Lyft filed U.S. Patent Application Publication 2021/0383496 (U.S. Patent Application No. 16/894,427) describing methods of identifying rider safety issues, including fraud, as they occurred in real time.[14]  It is worth noting that even though the methods were new, the technologies the methods required were not.  The patent application described software, hardware, and network technologies that all existed in 2020.

61.    The Lyft patent application clearly indicates Lyft's knowledge of rider safety issues by addressing risks posed by unidentified individuals providing Lyft services.  Lyft states, in terms clear enough for the United States Patent and Trademark Office to understand, that "drivers have at times attempted to evade screening procedures designed to ensure passenger safety.  For example, an approved driver may begin a session as a transportation provider and then switch places with an unauthorized driver in an attempt to allow that person to drive in their place."[15]

---

[12] Lyft, Inc., *Annual Report 2024*, at p. 17 (2025), available at https://s27.q4cdn.com/263799617/files/doc_financials/2024/ar/Lyft-Annual-Report-2024.pdf.

[13] *Id.*

[14] *Systems and methods for selectively controlling access to features of a digital document based on a determined user state*, U.S. Patent Application Publication 2021/0383496A1, ¶ 20 (filed June 3, 2021).

[15] *Id.* at ¶ 1.

COMPLAINT
Case No. 2:25-cv-11418

62.    Later in the patent application, Lyft provides additional perspective on the safety risk by indicating that "a driver may have been removed from the transportation management system as a valid provider, but may attempt to provide a false identity or use other means to regain approval as a valid provider."[16]  Lyft's express aim was clear: "**detect[ ] and prevent[ ] fraudulent drivers from providing rides**."[17]

63.    The Patent Application indicated that it could collect and analyze data that would provide safer experiences for its riders:

> This **telemetry data may be analyzed to derive a 'transportation profile' that distinguished or even uniquely identifies [Lyft drivers] based on their driving habits.**  For instance, this identification may identify a [Lyft driver's] propensity to drive or accelerate quickly or slowly, to corner quickly or slowly, to weave through traffic or perform other maneuvers in a consistent, identifiable manner.  In some examples, this telemetry data may be correlated with location and/or ride-history information to further identify driving habits on certain types of roads (e.g., highways versus city streets), in certain locations (e.g., urban versus rural settings), at different stages within the ride experience (e.g., with or without transportation requestors present in the vehicle), etc.[18]

64.    The collected data, the constructed driver profiles, the patent application (and eventual patent) indicate that Lyft has—for years—possessed the technical ability to introduce additional safeguards that could have protected riders, including Plaintiff, from interactions with unsafe or unauthorized drivers.  Despite its knowledge of—and apparent ability to safeguard against—these risks, Lyft's

---

[16] *Id.*
[17] *Id.* at ¶ 3.
[18] *Id.* at ¶ 23.

deliberate inaction allowed critical design defects to persist. Lyft did not implement the technology to create a safer rider experience nor did it warn Lyft riders of the risk.

65.    Rather than create a safer experience by correcting its products, Lyft prioritized profits over the safety of Plaintiff and countless others.

66.    Had Lyft implemented its technology, it would have identified the unauthorized Lyft driver that picked Plaintiff up, took her away from safety, and sexually assaulted her. The injuries Plaintiff has suffered would never have come to pass.

67.    Lyft's conduct is contrary to the representations put to shareholders, law enforcement, regulators, and to the public indicating "[p]assenger safety is a fundamental concern."[19]

**C.    Lyft's Designed a Defective Product**

68.    Lyft's knowledge of the flaws within the Lyft application is plain as day: the product allows any driver to use any other driver's profile. That flaw significantly deteriorates the value of the background check process—which Lyft has assigned to a third-party contractor to complete.

69.    The ability for Lyft drivers to simply and easily switch identities fatally defeats Lyft's safety process relying upon assessing past criminal history or identification. And Lyft knew it. In addition, Lyft's design flaw renders real time monitoring of these same critical factors meaningless.

70.    The Lyft design defect existed within the Lyft application since at least 2020 and has not ever been remediated or addressed. Despite updating the Lyft application many times over the course of those years, Lyft refused to take meaningful steps towards remediating its known design defect thereby continuing over time to expose Jane Doe, and Lyft riders like her, to injury and harm. Even if

---

[19] *Id.* at ¶ 1.

1  Lyft had tried to remediate this critical flaw it failed because the flaw presently exists
2  within the Lyft application.

3      71.    As the sole creator and developer of its application, there can be no doubt
4  that Lyft is the product's sole manufacturer.

5      72.    Lyft is the sole operator of the Lyft application and, in this capacity, is
6  also the sole distributor of the application, even though it provides its application to
7  users through various third-party "application stores."[20]

8      73.    Because Lyft is the sole creator, designer, manufacturer, and operator of
9  the application and controls all its functions, including its design and distribution
10 architecture, no doubt exists that the application was delivered to Jane Doe in a
11 defective state.

12     74.    Jane Doe used the product in exactly the way it was designed—she
13 called a ride.

14     75.    As the direct and proximate result of her reasonable use of Lyft's
15 defectively designed, manufactured, and distributed product, Lyft paired Jane Doe
16 with a Lyft driver who sexually assaulted her.

17     76.    Several reasonable alternatives existed to reduce the risk of harm Jane
18 Doe suffered.  One example, is the technology identified in the Lyft patent application
19 that predated her sexual assault by three years.  One proposed method of remediating
20 the risk indicated within that patent application is the use of then-existing technology
21 to confirm the physical identity of drivers sent by Lyft to transport authorized riders
22 by, for example using facial recognition and other machine learning tools.

23     77.    As a direct result of the Lyft design defect, Jane Doe suffered injuries
24 that were entirely foreseeable.

25 **D.    The Sexual Assault**

26

27  _____

28  [20] Lyft's Terms of Service confirm it is the sole distributor of the application.

78.    On February 1, 2023, at in or around 1:00 a.m., Jane Doe wanted to leave where she was—a bar in West Hollywood—so that she could meet a friend in downtown Los Angeles.  To ensure that she arrived safely, Jane Doe chose Lyft.

79.    She opened the Lyft application and entered her location: 9229 W. Sunset Blvd, West Hollywood, California.   She also entered her destination: downtown Los Angeles.  The Lyft application accepted both inputs entered by Jane Doe—both her present location and her indicated destination.  The Lyft application indicated to Jane Doe it had identified a driver that would arrive at her location shortly: Vahe.  At that time of day, early on a Wednesday morning, Jane Doe's Lyft—even with traffic—should have taken no longer than 30 minutes.

80.    But Jane Doe never arrived at her indicated location that morning.

81.    Vahe never arrived to transport Jane Doe.  Instead, Lyft sent Jane Doe's geo-location and ride assignment to a completely different Lyft driver.

82.    Jane Doe entered her Lyft at 1:26 a.m. and should have safely arrived at her destination in downtown Los Angeles no later than 2:00 a.m.  When she entered the Lyft she texted her friend that she was on her way.  At or near 1:58 a.m. her friends texted her to provide more specific arrival information so they could meet her Lyft when it arrived.  Jane Doe wouldn't receive those messages because the Lyft driver had taken Jane Doe's phone.

83.    Sometime, during the ride, the Lyft driver had taken possession of Jane Doe's phone.  Between 1:58 a.m. and 2:04 a.m., the Lyft driver—not Jane Doe—spoke to the friend and indicated they would arrive shortly.  At 2:10 a.m., the friend received a final communication from Jane Doe's phone that morning: a cryptic text containing only emojis.  Lyft never transported Jane Doe to downtown Los Angeles.  She was taken to a completely different location from the one she entered.  Rather than arriving in downtown Los Angeles around 2:00 a.m., Jane Doe's Lyft traveled in the wrong direction and arrived at her apartment complex at 2:17 a.m.  The driver

used Jane Doe's phone to bypass the apartment's security so that he could gain access to the complex. Lyft would ultimately charge Jane Doe for a ride ending over a half hour later at 3:02 a.m.

84. At or around 2:18 a.m. the driver sent by Lyft removed her from the Lyft and walked her to an elevator and, ultimately, into her apartment. He would remain in her apartment for nearly the next two hours, departing Jane Doe's apartment complex at or around 3:48 a.m.

85. Later that morning, Jane Doe awoke in her own apartment with no memory of what occurred after she ordered a Lyft the night before. Jane Doe contacted her friend. They confirmed she never arrived in downtown Los Angeles. She experienced and observed clear signs of recent sexual activity. She observed a used condom at the side of the bed in her apartment. She encountered physical pain indicating sexual activity. Jane Doe realized she had survived a sexual assault.

86. Jane Doe reported her sexual assault to law enforcement and completed a sexual assault forensic examination at a UCLA medical center later that same day.

87. The Lyft Driver was charged with violating California Penal Code § 261(a)(3) Felony Rape on May 21, 2025 for his sexual assault of Jane Doe.[21]

88. As a result of the Lyft attack, Jane Doe has and continues to experience physical and mental injury, anguish, and trauma that has upended her life, significantly impacted her interpersonal relationships, and harmed both her education and her career.

89. An actress with a rising profile in the Los Angeles entertainment community with an outgoing and engaging temperament, Jane Doe became withdrawn and depressed. Suffering from the injuries of her attack, Jane Doe often found it difficult to leave her apartment and attend auditions, often choosing not to.

---

[21] *People v. Mihran Martirosyan*, California Superior Court Case No. 25CJCF02857.

COMPLAINT
Case No. 2:25-cv-11418

A promising student of a prominent Los Angeles-based acting school, her injuries forced her to miss several classes and to, eventually, leave the acting school all together.

90.     Jane Doe continues to suffer injuries related to her assault today.

## CLAIM 1: NEGLIGENCE

91.     Jane Doe realleges and incorporates the allegations set forth in all of the preceding paragraphs in this Complaint.

92.     Lyft owed a duty of reasonable care to Plaintiff.

93.     Lyft had a duty of care to its riders, to meet the requirements set by law, and take reasonable measures to prevent unauthorized drivers from accessing the Lyft marketplace and sexually assaulting Lyft riders.

94.     Lyft had clear and certain knowledge of the risks posed by operating a defective Lyft marketplace where safety flaws rendered background checks unreliable.

95.     Lyft's litigation history indicates direct knowledge of several thousand cases alleging sexual assaults thereby rendering it entirely foreseeable that there was a significant problem regarding the sexual assault of Lyft riders using the Lyft marketplace.

96.     Lyft owed Jane Doe a duty of reasonable care to provide trained, safe, and supervised drivers.

97.     Lyft breached its duties in the following respects:

      a.     Failing to verify the identity of her assaulter;

      b.     Failing to deny her assaulter access to the Lyft application;

      c.     Failing to deny her assaulter access to the Lyft marketplace;

      d.     Failing to develop and implement sufficient screening and background check measures;

-22-
COMPLAINT
Case No. 2:25-cv-11418

e.   Failing to develop an adequate system to continuously monitor and confirm the identities of drivers using the Lyft application;

f.   Failing to develop adequate security measures to prevent imposter drivers;

g.   Failing to develop and implement measures to supervise and protect Lyft riders like her;

h.   Failing to verify whether the documents submitted by her assaulter to obtain access to the Lyft marketplace were accurate;

i.   Failing to require the name and/or contact information on the payment method for the driver to match the name on the account;

j.   Failing to properly develop and implement a system to track sexual assaults and take remedial measures to prevent future occurrences despite notice of the prevalence of such assaults by Lyft drivers;

98.   Lyft failed to take reasonable measures to stop the foreseeable and known risks of sexual assault to riders.

99.   Lyft breached its duty of care by failing to verify the identity of the Lyft driver it sent to pick up and transport Jane Doe.

100.   Lyft failed to implement or enforce their own policies regarding account creation for driving with Lyft.

101.   Lyft failed to utilize industry best practices and standards to stop the use of imposter drivers.

102.   As a direct and proximate result of Lyft's negligence, Jane Doe suffered a violent sexual assault.

103.   Plaintiff's injuries are permanent and continuing and she will continue to suffer losses in the future.

104.    Plaintiff's physical injuries included bruises, tears, trauma, bleeding, and other injuries commonly found in cases of violent sexual assault.  Jane Doe has suffered, and will continue to suffer, extreme and severe mental and emotional trauma, post-traumatic stress disorder, nightmares, anxiety, stress, behavioral changes, mental anguish and loss of enjoyment of life as a result of the needless trauma she suffered as a result of Lyft's negligence.

105.    Jane Doe reserves the right to amend her complaint as new information becomes available through the discovery process.

### CLAIM 2: NEGLIGENT HIRING, RETENTION, AND SUPERVISION

106.    Jane Doe realleges and incorporates the allegations set forth in all of the preceding paragraphs in this Complaint.

107.    Lyft engaged and retained or otherwise employed the Registered Lyft Driver who allowed another individual to use his Lyft account, the Lyft driver that assaulted, harassed, and/or otherwise attacked Jane Doe as described above.

108.    Lyft did not interview, do a background check of any kind, check the references of, provide training to, or advise the Lyft Driver of any anti-sexual assault policies when hiring him.  Lyft had no reasonable basis for believing Lyft drivers would not share their account, and indeed was aware that individuals did do this, with individuals who were not fit to drive vulnerable women around, particularly at night and failed to use reasonable care in determining whether the driver in question was fit for the task.

109.    Lyft should have known the Lyft Driver involved in the assault on Jane Doe was unfit; however, Lyft failed to use reasonable care to discover his unfitness and incompetence.

110.    Despite failing to reasonably endeavor to investigate the incompetence of Lyft drivers, including the one who harmed Jane Doe, for transporting vulnerable

and/or intoxicated women in a moving vehicle, Lyft hired said driver to do exactly that.

111.    Lyft knew or should have known that assigning the task of transporting vulnerable riders to an inadequately screened driver created an unreasonable risk of harm to Lyft's riders, including Jane Doe, particularly when Lyft had been on notice of the string of sexual assaults committed by Lyft's drivers.

112.    Lyft failed to employ measures to adequately supervise its drivers, including but not limited to ensuring that it was the registered driver using the account.

113.    Lyft failed to adequately record, investigate, and respond to passenger reports of unsafe conduct such as sexual harassment and sexual assault by Lyft drivers.

114.    Lyft was negligent in failing to terminate drivers it knew or reasonably should have known were a threat to riders, including but not limited to Jane Doe and other vulnerable female riders traveling alone.

115.    The Registered Lyft Driver and the Lyft Driver who assaulted Jane Doe was, and/or became, unfit to perform the work for which he was hired as he improperly and illegally took advantage of Jane Doe when she attempted to use the service for a safe ride to her destinations, which caused her psychological and/or physical harm.

116.    Because of the Lyft Driver's unfitness to perform the task of transporting Jane Doe, Jane Doe was assaulted, which humiliated, degraded, violated, and robbed Jane Doe of her dignity and personal safety.

117.    Lyft's negligence in hiring, retaining, and/or supervising Lyft drivers, including the driver who harmed Jane Doe, caused Jane Doe to be assaulted, battered, harassed, and/or otherwise attacked by the Lyft Driver, which humiliated, degraded, violated, and robbed Jane Doe of her dignity and personal safety. The depraved attack

COMPLAINT
Case No. 2:25-cv-11418

1  on Jane Doe caused Jane Doe to suffer physical and/or psychological harm from
2  which she may never fully recover.

3      118.  As a direct and proximate result of Defendants' negligent supervision,
4  hiring, and retention of Lyft drivers, including the driver who harmed Jane Doe, Jane
5  Doe suffered economic and non-economic damages.

6      119.  Jane Doe seeks actual and punitive damages based upon Defendants'
7  wanton and reckless disregard for her safety.

8            **<u>CLAIM 3: PRODUCT LIABILITY</u>**

9      120.  Jane Doe realleges and incorporates the allegations set forth in all of the
10 preceding paragraphs in this Complaint.

11     121.  Jane Doe incorporates and re-alleges, by reference, all other paragraphs
12 of this Complaint as if fully set forth herein.

13     122.  Defendant Lyft "offers a ride-sharing service, but it provides its own
14 proprietary product—the Lyft application—that its drivers and riders are required to
15 use in order to provide or receive the service that Lyft is selling."[22]

16     123.  The Lyft product at the time of the sexual assault was defective and an
17 unreasonably dangerous condition to the public, including Jane Doe.

18     124.  The Lyft product is expected to and does reach the consumer in this
19 defective condition in the manner designed and sold by Lyft.

20     125.  The design defects include, but are not limited to, a design that does not
21 comport with the legal and regulatory requirements for driver qualifications in the
22 State of California.

23     126.  The design defects include, but are not limited to, a design that fails to
24 detect and block imposter driver accounts from using the Lyft application to access
25 the Lyft marketplace to transport the public.

26
27
28

---

[22] *See Doe v Lyft, Inc.*, 756 F.Supp. 3d 1110, 1120 (D. Kan. Nov. 1 2024).

127.  The design defects include, but are not limited to, a failure to utilize readily available systems and technologies to confirm the identity of their drivers before they pick up rides.

128.  The design defects include, but are not limited to, a system that fails to conduct subsequent background checks on its drivers.

129.  The design defect(s) caused Jane Doe's injury.

130.  Defendant Lyft sold the product and is in the business of selling products.

131.  Jane Doe sustained damages.

132.  Jane Doe reserves the right to amend her complaint as new information becomes available through the discovery process.

## CLAIM 4: NEGLIGENT FAILURE TO WARN

133.  Jane Doe realleges and incorporates the allegations set forth in all of the preceding paragraphs in this Complaint.

134.  Lyft's conduct created a risk of physical or emotional harm to its riders, including Jane Doe.

135.  In operating its business, Lyft knew and had reason to know that its riders were at risk of sexual assault and abuse by Lyft's drivers since at least 2015. Since then, Lyft has received frequent passenger complaints about driver misbehavior, has been notified of police investigations of drivers' criminal conduct while acting in their capacity as Lyft drivers, and has been the subject of numerous civil suits alleging the sexual harassment and assault of Lyft's riders by Lyft's drivers.

136.  Despite the knowledge of the danger its enterprise creates, Lyft did not alert its riders, including Jane Doe, to the risk of sexual harassment and assault by Lyft drivers.  In fact, Lyft continued to market itself as a service that provides "safe" rides, even to unaccompanied and/or intoxicated riders.

137.    In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft riders during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, Lyft's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault.

138.    Nowhere on Lyft's website does Lyft discuss the occurrence or risk of sexual assault by Lyft's Drivers.

139.    Lyft itself represented to its riders that riding with Lyft is safe, implying it is free of risk from physical and/or sexual assault.

140.    Lyft did not warn that its criminal background checks of Lyft drivers were limited, nor did it warn that it sometimes allows drivers to continue driving for Lyft even after a passenger reports to Lyft that she was physically and/or sexually assaulted.

141.    Lyft had reason to know that riders would be unaware of the risk of physical and/or sexual assault by Lyft drivers.  A warning to its riders that they were at risk of physical and/or sexual assault by Lyft drivers would have reduced the risk of harm to riders, including Jane Doe, who could have arranged for alternative transportation or taken additional safety precautions and avoided the assaults they suffered at the hands of Lyft drivers.

142.    Jane Doe would not have ridden alone in a Lyft had Lyft provided an adequate warning regarding the risk of being assaulted, battered, harassed, and/or otherwise attacked by a Lyft driver.

143.    As a legal and proximate result of Lyft's actions and omissions, Jane Doe was attacked by the Lyft Driver, which humiliated, degraded, violated, and

robbed Jane Doe of her dignity and personal safety.  The attack on Jane Doe caused Jane Doe to suffer physical and/or psychological harm from which she may never fully recover.

144.   As a direct and proximate result of Defendants' negligent failure to warn, Jane Doe suffered economic and non-economic damages.

145.   Jane Doe seeks actual and punitive damages based upon Defendants' wanton and reckless disregard for her safety.

146.   Jane Doe reserves the right to amend her complaint as new information becomes available through the discovery process.

## CLAIM 5: NEGLIGENCE *per se*

147.   Jane Doe realleges and incorporates the allegations set forth in all of the preceding paragraphs in this Complaint.

148.   Jane Doe incorporates and re-alleges, by reference, all other paragraphs in this Complaint as if fully set forth herein.

149.   Lyft had a duty to follow the law as outlined in California Public Utility Code § 5445.2 for the safety of the public, for riders, and for Jane Doe.

150.   Lyft had a duty to follow the law as outlined in California Business & Professions Code § 7458 for the safety of the public, for riders, and for Jane Doe.

151.   By failing to follow California law, Lyft breached its duty to Jane Doe.

152.   As a direct and proximate result of Defendant Lyft's negligence per se, Jane Doe sustained injuries, damages, and losses as set forth herein.

153.   Jane Doe reserves the right to amend her complaint as new information becomes available through the discovery process.

## CLAIM 6: ASSAULT (VICARIOUS LIABILITY)

154.   Jane Doe realleges and incorporates the allegations set forth in all of the preceding paragraphs in this Complaint.

COMPLAINT
Case No. 2:25-cv-11418

155.    When the driver sent by Lyft sexually assaulted Jane Doe, he intended to cause harmful or offensive contact, as he forced himself upon her and sexually assaulted her.

156.    Jane Doe reasonably believed she was about to be touched in a harmful or offensive manner.

157.    Jane Doe did not consent to this touching.

158.    The sexual assault began and continued during a Lyft ride and was begun by a driver sent to Jane Doe by Lyft.

159.    The battery occurred during the course and scope of the Lyft ride.

160.    As a legal result of the assault committed by the Lyft driver, and Lyft's direct and vicarious liability, Jane Doe was harmed by the Lyft's complete and purposeful disregard for her rights and safety and suffered great emotional and physical damage as a result.

## CLAIM 7: BATTERY (VICARIOUS LIABILITY)

161.    Jane Doe realleges and incorporates the allegations set forth in all of the preceding paragraphs in this Complaint.

162.    When the driver sent by Lyft sexually assaulted jane Doe, he touched her intending to cause harmful or offensive contact and did indeed accomplish sexually offensive contact, as he forced himself upon her.

163.    When the driver sexually assaulted Jane Doe he caused an imminent fear of a harmful or offensive contact with Jane Doe's vagina by use of his groin, and sexually offensive contact with Jane Doe resulted, either directly or indirectly, as he forced himself upon her.

164.    Jane Doe did not consent to the driver's touching.

165.    Jane Doe was harmed by the driver's complete and purposeful disregard for her rights and safety and suffered great emotional and physical damage as a result.

166.    The sexual battery occurred during the course and scope of the Lyft ride.

167.   As a legal result of the assault committed by the Lyft driver, and Lyft's direct and vicarious liability, Jane Doe was harmed by the Lyft's complete and purposeful disregard for her rights and safety and suffered great emotional and physical damage as a result.

### CLAIM 8: NEGLIGENT MISREPRESENTATION

168.   Jane Doe realleges and incorporates the allegations set forth in all of the preceding paragraphs in this Complaint.

169.   Lyft represented to Jane Doe and to the general public that safety is Lyft's top priority, and that it is Lyft's goal to make every ride safe, comfortable, and reliable.  At the time of the sexual assault alleged, Lyft knew that a number of its drivers had previously preyed on vulnerable female riders by sexually molesting, assaulting, harassing, and/or raping them.

170.   Lyft continues to represent that its services were safe to further Lyft's own pecuniary interests.

171.   In choosing to represent to its riders that its services were safe, Lyft had a duty to provide correct and accurate information about the actual safety of its services.

172.   Lyft knew or should have known that it could not provide the safe ride that it represented it could.

173.   Knowing of the incidence of sexual assault of its riders by its drivers and knowing that Lyft had not implemented adequate precautions, Lyft had no reasonable grounds for believing that it could provide Jane Doe and other riders a safe ride as represented.

174.   In getting into the Lyft, Jane Doe reasonably relied on Lyft's representations that it would get her safely to her intended destination.

COMPLAINT
Case No. 2:25-cv-11418

175.   In trusting and relying on Lyft's representations, Jane Doe was placed in a uniquely vulnerable position that was taken advantage of by a Lyft employee, the Lyft Driver who attacked Jane Doe.

176.   As a direct and proximate result of Lyft's conduct, Jane Doe was subjected to fear, intimidation, and physical harm including sexual assault and rape which humiliated, degraded, violated, and robbed her of her dignity and personal safety.  The attack on Jane Doe caused her to suffer physical and/or psychological harm from which she may never fully recover.

177.   As a direct and proximate result of Lyft's negligent misrepresentations, Jane Doe suffered economic and non-economic damages.

178.   Jane Doe will seek actual and punitive damages based on Defendants' above described actions, which evidence wanton and reckless disregard for the safety of riders like Jane Doe.

## CLAIM 9: INTENTIONAL MISREPRESENTATION

179.   Jane Doe realleges and incorporates the allegations set forth in all of the preceding paragraphs in this Complaint.

180.   Lyft represented to Jane Doe and the general public that safety was Lyft's top priority, and it was Lyft's goal to make every ride safe, comfortable, and reliable.  At the same time, Lyft already knew that a number of drivers had preyed on vulnerable female riders by sexually molesting, assaulting, harassing, and/or raping them.

181.   Lyft made intentional misrepresentations of fact to all users of the Lyft application, including Jane Doe, that were known by Lyft to be false including the false statements Lyft made, stating it would provide Jane Doe with a safe ride to her destination.

182.   These representations regarding safety were made to Lyft riders, including Jane Doe, through periodic emails Lyft sent to, social-media

advertisements, and Lyft's own website and application.  Jane Doe relied upon several advertisements and statements where Lyft proclaimed it would provide a safe ride.

183.   Prioritizing profits over passenger safety, Lyft made these intentional misrepresentations of material fact to induce women, including Jane Doe, to use Lyft's services.

184.   Lyft made these representations to Jane Doe and the general public despite knowing it had chosen not to take the measures necessary to provide a safe ride to her intended destination and, as a result, continued physical and/or sexual assault of its riders by its drivers was a foreseeable occurrence.

185.   Lyft made these representations to induce women, like Jane Doe, to use Lyft's services and to derive profit from women like Jane Doe.

186.   In entering a Lyft vehicle, Jane Doe reasonably relied on Lyft's representations that it would get her safely to her destination.

187.   In trusting and relying on Lyft's representations, Jane Doe was placed in a uniquely vulnerable position that was taken advantage of by the Lyft driver who raped Jane Doe.

188.   Lyft's conduct evinces a wanton, callous, and reckless disregard for the safety of riders like Jane Doe.

189.   As a direct and proximate result of Lyft's intentional misrepresentations, Jane Doe was raped by the Lyft driver, which humiliated, degraded, violated, and robbed Jane Doe of her dignity and personal safety.  The depraved attack on Jane Doe caused her to suffer physical and/or psychological harm from which she may never fully recover.

190.   As a direct and proximate result of Lyft's intentional misrepresentations, Jane Doe suffered economic and non-economic damages.

1

## CLAIM 10: FRAUD

2    191.    Jane Doe realleges and reasserts each of the preceding paragraphs as if

3    fully set forth herein.

4    192.    Lyft made intentional misrepresentations of facts to Jane Doe known to

5    be false, that Jane Doe, would be safe taking a Lyft ride with a driver whose

6    background had been sufficiently screened by Uber, and who would provide her with

7    safe passage, but who, in reality, Lyft had not screened in any way adequate in its

8    industry, and who was actually a grave threat to Jane Doe's safety and well-being as

9    known, or should have been known, by Lyft.

10    193.    Lyft made these misrepresentations for profit making purposes to Jane

11    Doe despite knowing that it had not implemented adequate safety and security

12    measures, including adequate driver screening, background check procedures,

13    ongoing monitoring of driver conduct while driving, and adequate ride safety

14    measures.

15    194.    Lyft's fraud included its indication that it would provide a safe ride home

16    for her even if she was intoxicated, that Lyft would accurately track Jane Doe from

17    where she was picked up to her destination, and that it would provide her with an

18    authorized driver who had completed its security and screening procedures in

19    exchange for her payment.

20    195.    Lyft's fraud concerning its safety measures were made knowingly, or

21    with a willful, wanton, and reckless disregard for the truth, and intended to deceive

22    and defraud Jane Doe into agreeing to utilize and pay for its services.

23    196.    Lyft conducted this fraud with the intent to cause Jane Doe to rely on

24    this false information and to induce her into utilizing its services knowing that

25    otherwise Jane Doe would not have entered the Lyft vehicle.

26    197.    Jane Doe actually and reasonably relied on the false facts, conduct, and

27    representations provided by Lyft when she agreed to utilize its services, after being

28

advised that Lyft had selected and screened her driver and that he would provide her with safe transport.

198.    As a result of Lyft's fraud Jane Doe suffered significant damages, assault, and rape.

## CLAIM 11: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

199.    Jane Doe realleges and incorporates the allegations set forth in all of the preceding paragraphs in this Complaint.

200.    For several years before Jane Doe was assaulted by the driver Lyft sent to transport her, Lyft was fully aware that other female riders had been assaulted during Lyft rides.

201.    Lyft made calculated decisions against implementing technologies and procedures that would effectively screen dangerous or unauthorized drivers.

202.    Safety precautions such as enhanced background checks, biometric fingerprinting, applicant interviews, and electronic monitoring systems would have cost Lyft money by decreasing its revenues.

203.    Lyft decided against implementing foundational safety precautions and instead elected to place riders at greater risk of assault and harassment.

204.    Additional safety precautions that Lyft chose not to make include, but are not limited to: ongoing monitoring of Lyft drivers through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with riders; and a zero-tolerance policy for drivers that substantially deviate from the assigned route without explanation. Lyft chose not to implement such precautions, nor did it warn riders of the risk of being physically and/or sexually assaulted given that these safety precautions had not been implemented.

205.   In failing to take these and other safety precautions designed to protect riders from sexual predators driving for Lyft, Lyft breached its duty of reasonable care.

206.   As a direct and proximate result of Lyft's negligent infliction of emotional distress, Jane Doe suffered economic and non-economic damages.

207.   Jane Doe seeks actual and punitive damages based upon Defendants' wanton and reckless disregard for her safety.

### CLAIM 12: BREACH OF CONTRACT

208.   Jane Doe realleges and incorporates the allegations set forth in all of the preceding paragraphs in this Complaint.

209.   Jane Doe entered a contract with Lyft.  The essence of this commercial transaction was the payment of a fee to Lyft in exchange for safe and reasonable transportation to Jane Doe' destination.

210.   As a result of the conduct, acts, and omissions set forth above, Lyft breached its contract with Jane Doe, including breaching implied covenants inherent in such a contract.

211.   As a direct and proximate result of Lyft's breach of contract, Jane Doe suffered economic and non-economic damages.

### CLAIM 13: CAL. BUS. & PROF. CODE 17200 *et seq.*

212.   Jane Doe realleges and incorporates the allegations set forth in all of the preceding paragraphs in this Complaint.

213.   California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business acts or practices."

214.   Lyft's conduct violated California Public Utility Code § 5445.2 and is unlawful.

215.   Lyft's conduct violated California Business & Professions Code § 7458 and is unlawful.

216.   Lyft's conduct was unfair because it was unscrupulous, contrary to public policy, and presented a serious risk of harm to persons Lyft was responsible for protecting.

217.   Lyft's conduct was fraudulent because it was grounded in Lyft's representations that it would protect its riders' safety.

218.   Lyft's conduct was grounded in unfair competition because the company enjoys a competitive advantage by not adequately protecting its riders.

219.   Jane Doe has suffered injury in fact and has lost money or property as a result of Lyft's unfair, illegal, and uncompetitive conduct.  Lost money or property includes money spent on rides falsely promoted as safe and other economic damages.

220.   Lyft's conduct is ongoing.

221.   Jane Doe seeks appropriate injunctive relief to prevent future unfair competition.

### **REQUEST FOR RELIEF**

222.   Plaintiff requests for the following relief:

      a.   Entry of judgment on each of her claims against Defendants

      b.   Past and future economic and non-economic damages including physical pain, mental anguish, anxiety, medical expenses, lost earnings or earning capacity;

      c.   Punitive damages;

      d.   Pre- and post-judgment interest;

      e.   The costs and expenses of litigation;

      f.   Attorneys' fees;

      g.   Equitable relief; and

      h.   Such other relief as this Court may deem just and proper.

**PUNITIVE DAMAGES**

223.   Jane Doe realleges and incorporates the allegations set forth in all of the preceding paragraphs in this Complaint.

224.   As stated above, Lyft knew that it faced an ongoing problem of sexual predators driving for Lyft and assaulting its riders.  As early as 2014 Lyft knew that its drivers were physically and/or sexually assaulting female riders.  Since 2014, Lyft has received frequent passenger complaints about driver physical and/or sexual misconduct, including physical and/or sexual assault and rape, it has been notified of police investigations of the criminal physical and/or sexual conduct of drivers acting within their capacity as Lyft drivers, and it has been the subject of numerous civil suits and/or arbitrations alleging the sexual harassment and physical and/or sexual assault of Lyft's riders by Lyft's drivers and those who impersonate Lyft drivers.

225.   Nevertheless, even though Lyft was fully aware of its sexual predator problem it failed to take safety precautions to protect its riders.

226.   Even after Lyft was aware some Lyft drivers were using driving for Lyft as an opportunity to get unsuspecting women into their vehicles and to physically and/or sexually assault them, Lyft and its executing officers made the conscious decision not to implement measures to thoroughly vet its drivers before and after hiring them.

227.   The decision not to implement more thorough and persistent background checks was driven by Lyft executives' desire for rapid expansion and increased profits, because the more drivers driving for Lyft, the more money there was to be made.

228.   Prioritizing profits over safety, Lyft and its executive officers also made the conscious decision not to warn its customers/users of the risk of being assaulted even after Lyft and its leadership were fully aware of this risk.

229. Safety precautions such as enhanced background checks; biometric fingerprinting; job interviews; electronic monitoring systems; ongoing monitoring of Lyft drivers and rides through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with riders or by deviating substantially from the assigned route; a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride; a system for checking in with and verifying a passenger's safety when a driver prematurely terminates a ride or significantly deviates from the intended route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; a zero-tolerance policy for fraternizing with riders; creating and instituting a system encouraging customer reporting; adequate monitoring of customer complaints by well-trained and effective customer-service representatives; warnings to riders of the dangers of being attacked by Lyft drivers; and cooperation with law enforcement when a driver attacks a passenger would have cost Lyft money and reputational damage. Because of this, Lyft, at the direction of its corporate officers, decided not to implement such precautions and instead has continued to place its riders at greater risk of kidnapping, sexual assault, rape, and exploitation by Lyft's own drivers.

230. Prioritizing profits over passenger safety, Lyft and its executive officers acted, and continue to act, recklessly and in knowing, conscious disregard of the safety of its riders, including that of Plaintiff, and the public.

231. As a direct and proximate result of the intentional, negligent, reckless, grossly negligent conduct of Lyft, Plaintiff was assaulted by the Lyft Driver, which humiliated, degraded, violated, and robbed her of her dignity and personal safety.

232. The attack on Plaintiff caused Plaintiff to suffer serious emotional distress as well as physical and/or psychological harm from which she may never fully recover.

1    233.   As a result of Lyft's misconduct as stated above, Plaintiff seeks punitive

2    damages to punish Lyft for its misconduct and to deter future misconduct.

3                              **JURY DEMAND**

4    234.   Plaintiff demands a trial by jury on all issues so triable.

5

6    DATED: November 28, 2025        By:    /s/ *Alison L. Anderson*

7                                           Alison L. Anderson (SBN 275334)
                                           *alanderson@bsfllp.com*

8                                           Joshua Y. Quaye (SBN 325480)
                                           *jquaye@bsfllp.com*

9                                           2029 Century Park East, Suite 1520

10                                          Los Angeles, CA 90067

11                                          Telephone: (213) 629-9040
                                           Facsimile: (213) 629-9022

12

13                                          Kenya K. Davis (*pro hac vice*
                                           *forthcoming*)

14                                          1401 New York Ave., NW

15                                          Washington, DC 20005
                                           *kdavis@bsfllp.com*

16

17

18

19

20

21

22

23

24

25

26

27

28
COMPLAINT
Case No. 2:25-cv-11418